## Reynolds v. Commonwealth.

(Decided April 24, 1931.)

486

HUBERT MEREDITH for appellant.

J. W. CAMMACK, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

Under an indictment charging him with the wilful murder of Pete Miller, the appellant, Tiney Reynolds, was tried and convicted of voluntary manslaughter, and his punishment fixed at confinement in the penitentiary for a period of ten years.

Appellant and deceased were brothers-in-law, and both were coal miners employed in a mine at Cleaton, Ky., and were members of the local union of the United Mine Workers of America. A bitter feeling existed between the members of the union and the coal operators. Meetings of the union were frequently held, and, though secrecy was enjoined upon each member, reports of what transpired at the meetings were made by some one to the representatives of the coal operators. The deceased circulated a report to the effect that the appellant had divulged the secrets of the miner's organization to the coal operators.

On the night of the killing a meeting of the union was held at the opera house in Cleaton which both appellant and deceased attended. Elbert Piper, a brother-in-law of both Reynolds and Miller, testified that appellant, who was sitting just behind him at the meeting, inquired why Miller was at the meeting, and he (Piper) responded that Miller was a member of the union and had a right to be present, and that appellant then said, 'Well, by God, I am here to see him about some damn lies he was telling Ernest Bean today on me.'' Bean was the mine foreman. Piper is corroborated as to this conversation by two or three witnesses who claimed they overheard it. On the other hand, the appellant denied having any conversation with Piper in the opera house.

A number of witnesses testified that he was sitting at least 25 feet from Piper and at no time was near enough to Piper to hold any conversation with him. When the meeting adjourned appellant accosted deceased near the door of the opera house and said, "Pete, I want to see you about them damn lies you told Beanie today." Miller admitted making the statements attributed to him, but stated they were true. From this point the evidence as to what occurred is in hopeless conflict.

Piper and a number of other witnesses for the commonwealth testified that, when deceased stated that the charges made by him were true, the appellant said, "That is a damn lie," and drew a pistol. Thereupon appellant's brother, Ves Reynolds, referred to by the witnesses as "Scrapper" Reynolds, rushed in and grabbed deceased and threw him down, whereupon Elbert Piper struck Ves Reynolds on the head with a carbide lamp. While deceased was still on the ground appellant fired two shots into his body, one striking him in the back. On the other hand, appellant and a number of witnesses introduced by him testified that immediately after deceased admitted making the statements attributed to him, and said they were true, he struck appellant over the head with a pistol knocking him to the ground; that Scrapper Reynolds and Elbert Piper then joined in the fight, during which deceased drew a pistol and fired one shot at appellant, and that appellant then fired two or three shots at the deceased. Some of the witnesses testified that the pistols were fired almost simultaneously, and some of them testified that deceased's pistol was fired first.

One of the grounds urged by appellant for a reversal of the judgment is that the verdict is flagrantly against the weight of the evidence. But, if the commonwealth's evidence is true, the killing was unjustifiable and the appellant did not shoot in his necessary self-defense as claimed by him. A number of witnesses testified that the deceased was unarmed and was shot in the back while on the ground. Probably the weight of the evidence was to the effect that the deceased was armed and was the aggressor, but there is ample evidence to authorize the verdict. Juries are the judges of the credibility of witnesses and may disregard the testimony of any or all of them. Five witnesses introduced by the commonwealth testified that they were eyewitnesses to the killing, and that appellant was the aggressor. Appellant and nine

witnesses introduced by him testified that the deceased was the aggressor. It is true that most of the witnesses for the commonwealth were related by blood or marriage to the deceased, and hostility to the appellant on the part of some of them may be inferred from their testimony, but that fact affected only their credibility, which was for the jury. The evidence as to who was the aggressor was in sharp conflict, but it is not for us to say what the verdict should have been. As we are unable to say that the verdict returned by the jury is flagrantly against the evidence, we are without authority to disturb the judgment on that ground.

Another ground relied on for reversal is that the court erred in overruling appellant's motion for a continuance on account of absent witnesses. His affidavit for a continuance set out the facts he claimed he could prove by the witnesses if present in person. This affidavit was read on the trial as the depositions of the absent witnesses. These witnesses were Arthur Roark, Lucille Divine, and Jack Vincent. In the affidavit for a continuance it was stated that Roark and Vincent were present when Miller was killed. All of the facts which appellant claimed in the affidavit he could prove by these two witnesses were testified to by at least eight other witnesses. Their testimony was merely cumulative.

Jess Rose, a witness for the commonwealth, testified that he was present at the time of the killing, and that appellant shot deceased when the latter was on the ground and unarmed. In the affidavit for a continuance it was stated that Lucille Divine would say that Rose stated to her that he was not present at the time of the killing. Tommy Divine, husband of Lucille Divine, testified that such a statement was made by Rose.

The granting of a continuance in a criminal case is addressed to the sound discretion of the trial court, and, unless that discretion, under all the circumstances, is abused, the refusal of the court to grant a continuance will not constitute reversible error. Browder v. Commonwealth, 232 Ky. 205, 22 S. W. (2d) 615. Here the testimony of the absent witnesses was merely cumulative. The affidavit was read as their depositions, and there is nothing to indicate that their personal presence would have added any weight to their testimony thus admitted. Under these circumstances the court did not abuse a sound discretion in refusing to grant a continuance.

It is next insisted that the court erred in rejecting certain testimony. While on the witness stand appellant was asked, "What was it you and Pete Miller were talking about that Pete Miller is supposed to have told Beany or that you claim is not true and that Miller claimed was true?" The commonwealth attorney's objection to this question was overruled, and appellant answered, "He told them that I was taking things from the—secrets from the lodge to him, to Beany, the mine foreman." The attorney for the commonwealth objected to the answer on the ground that the witness was stating what Bean claimed Miller had told him. The court in ruling on the objection said: "You will have to get that in a different way from what it is now." The appellant argues that he was denied the right to tell the jury the subject of the difficulty as discussed by him and Miller at the time of the killing. However, immediately after the ruling complained of was made he was asked the following questions and made the following answers:

"Q. Mr. Reynolds, did Pete Miller know what it was that you claimed that he had told Bean? A. I reckon he did from what he said.

"Q. What did he say that made you think he understood what you meant? A. He said, 'By God, if I hadn't meant it I wouldn't have said it.'

"Q. What was that he meant? A. He meant that he said I was carrying secrets from the lodge to the mine foreman."

Objections of the commonwealth's attorney to the above questions and answers were overruled. Thus it will be seen appellant was permitted to testify concerning all the matters discussed by him and Miller at the time of the killing and to give the subject-matter of the controversy, which was that Miller had said that appellant was carrying secrets from the lodge to the mine foreman.

It is finally insisted that the trial court erred in refusing to grant appellant a new trial on the ground of newly discovered evidence. In his affidavit in support of this ground appellant stated that he could not have discovered this evidence before the trial by the exercise of due diligence. He filed the affidavits of J. B. Tanner, Everett Ashley, and Claud Jones. Tanner stated that he was subpoenaed and appeared as a witness for the

commonwealth, but that he was not called as a witness; that Elbert Piper, one of the witnesses for the commonwealth, endeavored to persuade him to swear falsely that a short time before the shooting, which resulted in the death of Miller, the appellant, Tiney Reynolds, threatened to kill Miller. He also stated in his affidavit that he saw Miller after the latter was shot and before he died, and that Miller said in his presence that he struck Tiney Reynolds over the head with the butt of the pistol and shot at him once. Everett Ashley in his affidavit stated that a few days after Miller's death Elbert Piper said in his presence that Miller struck appellant with a pistol before appellant shot him, and that Miller fired one shot. Ashley was subpoenaed as a witness for the appellant and testified on the trial, but not on the matter set out in his affidavit. The facts set out in the affidavit of Claud Jones were of an impeaching nature and not important. Most of the facts disclosed in the affidavits of Tanner and Ashley were merely cumulative, but, even had they been of such a controlling character as probably to affect the result on another trial, it cannot be said this evidence could not have been discovered by the exercise of due diligence. Tanner was subpoenaed as a witness for the commonwealth and was present at the trial. He was not called by the commonwealth, and appellant was then put on notice that he was probably acquainted with some of the facts connected with the case, and, if he had then interviewed him, he could have ascertained what Tanner knew about the case. Ashley was appellant's own witness, and before he put him on the stand he should have ascertained all that he knew in regard to the facts in order that they might be developed by his examination on the trial. But, aside from the question of due diligence, substantially all of the newly discovered evidence was cumulative or tended to impeach witnesses who testified for the commonwealth. As said in Williams v. Commonwealth, 230 Ky. 327, 19 S. W. (2d) 964, 966: "Such character of additional evidence except under unusual circumstances—not appearing in this case—does not authorize a retrial of a case."

A careful consideration of the record fails to disclose any error prejudicial to appellant's substantial rights.

The judgment is affirmed.